Jie Li (SBN 354432)
Glacier Law LLP
251 South Lake Ave Suite 910
Pasadena, California 91101
Telephone: 312.448.7772
Facsimile: 312.801.4587
Email: jie.li@glacier.law

Dandan Pan (PHV admitted)
Glacier Law LLP
41 Madison Avenue, Ste. 2529
New York, NY 10010
Telephone: 212-927-5033
Email: dandan.pan@glacier.law

Kevin J. O'Connor (PHV admitted)
Peckar & Abramson, P.C.
70 Grand Avenue
River Edge, NJ 07661
Telephone: (201) 343-3434
Email: koconnor@pecklaw.com
*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AIRDOCTOR, LLC, a Delaware Limited Liability Company, <br><br> Plaintiff, <br><br> v. <br><br> LONNI., et. al, <br><br> Defendants. | Case No.: 2:23−cv−00353−GW−AS <br><br> **DEFENDANTS' FIRST AMENDED COUNTERCLAIMS** <br><br> JUDGE: Hon George H. Wu <br><br> Complaint Filed: January 18, 2023 <br> Second Amended Complaint Filed: December 10, 2025 |
| LONNI, INC., SHENZHEN DAZHAN PENGTU INTERNET CO., LTD., and DONGGUANSHILIANRUIZHONGXINWANGLUOKEJIYOUXIANGONGSI <br><br> *Counterclaim Plaintiffs*, | |

AMENDED COUNTERCLAIMS

v.

AIRDOCTOR, LLC, IDEAL LIVING, LLC, RESPONSE PRODUCTS, LLC D/B/A IDEAL LIVING DIRECT, IDEAL LIVING MANAGEMENT LLC, and IDEAL LIVING HOLDINGS, LLC,

Counterclaim Defendants.

AMENDED COUNTERCLAIMS

# AMENDED COUNTERCLAIMS

Counterclaim Plaintiffs Lonni, Inc. ("Lonni"), Shenzhen Dazhan Pengtu Internet Co., Ltd. ("Dazhan") and DONGGUANSHILIANRUIZHONGXINWANGLUOKEJIYOUXIANGONGSI ("Lianrui") (collectively, "Counterclaim Plaintiffs") by and through their undersigned counsel, hereby bring the below Counterclaims against AirDoctor, LLC ("AirDoctor"), Ideal Living, LLC ("Ideal Living"), and Response Products, LLC d/b/a Ideal Living Direct ("Ideal Living Direct"),  Ideal Living Management LLC ("Ideal Living Management"), and Ideal Holdings, LLC ("Ideal Holdings" and, when referred to collectively with AirDoctor, Ideal Living, Ideal Living Direct, and Ideal Living Management, collectively "Counterclaim Defendants"), alleging the following on personal knowledge or, where Counterclaim Plaintiffs lack personal knowledge, upon information and belief.

## INTRODUCTION

1. This is an action seeking redress for (I) False Advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a), (II) violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq., (III) violations of the California False Advertising Law (Cal. Bus. & Prof. Code § 17500 *et seq.*).

## PARTIES

2. Lonni is a Colorado corporation with its principal place of business located at 320 S Main St, Hasty, CO 81044.

3. Dazhan is a Chinese entity with an address of 407, Building 11, Bai Men Qian Industrial Zone, Longgang District, Shenzhen City, Guangdong Province, 518144 China.

4. Lianrui is a Chinese entity with an address of Baxingfang Village Road, Room 302, No. 33 Daoxia Road, Baxingfang Village, Humen Town, Dongguan City, Guangdong Province, 523899 China.

5. Upon information and belief, AirDoctor is a Delaware limited liability company with its principal place of business located in Sherman Oaks, California.

6. Upon information and belief, Ideal Living, LLC is a Delaware limited liability company with its principal place of business located at 14724 Ventura Blvd Ste 200, Sherman Oaks, CA 91403.

7. Upon information and belief, Ideal Living owns and operates the website https://enterprise.idealliving.com/ that markets and distributes for sale certain AirDoctor replacement air filters. During the time period relevant to these Counterclaims, Ideal Living has conducted substantial business throughout the United States, and in this District, including through the above-referenced website.

-4-

AMENDED COUNTERCLAIMS

8. Upon information and belief, Response Products is a California limited liability company with its principal place of business located at 14724 Ventura Blvd, Ste. 200, Sherman Oaks, CA 91403.

9. Upon information and belief, Response Products owns and operates the Amazon storefront Ideal Living Direct that markets and distributes for sale certain AirDoctor replacement air filters. During the time period relevant to these Counterclaims, Response Products has conducted substantial business throughout the United States, and this District, including on Amazon.com.

10. Upon information and belief, Ideal Living Management is a Delaware limited liability company with its principal place of business located in Sherman Oaks, California.

11. Upon information and belief, Ideal Living Holdings is the parent company of Ideal Living Management, and AirDoctor.

12. Upon information and belief, and as is detailed below, at all times relevant hereto, each Counterclaim Defendant was the agent, servant, partner, alter ego, and/or joint venturer of the other Counterclaim Defendants, and acted within the course and scope of such relationship.

**JURISDICTION AND VENUE**

13. This Court has personal jurisdiction over the parties to this action and venue is proper in this Court.

14. This is an action for False Advertising arising under the Lanham Act, 15 U.S.C. § 1125; to redress violations of California's Unfair Competition Law arising under Cal. Bus. & Prof. Code, § 17200, *et seq.*; and pursuant to California False Advertising Law under Cal. Bus. & Prof. Code, § 17500, *et seq.*

15. This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) and (b), and 15 U.S.C. § 1121(a). This Court also has supplemental jurisdiction over the state law claims set forth in these Counterclaims pursuant to 28 U.S.C. § 1367.

16. This Court has personal jurisdiction over Airdoctor because Airdoctor has operated in this District, has its principal place of business in this District, and because the claims asserted herein arose in this judicial district. This Court has personal jurisdiction over Ideal Living, Ideal Living Holdings, and Response Products because, on information and belief, they are California limited liability companies with their principal place of business in Sherman Oaks, California and have substantial business operations in this District.

17. This Court has personal jurisdiction over Ideal Living Management because, on information and belief, this entity has  its principal place of business in this District and has  substantially operated in this district, including the commission of the wrongdoing set forth below.

18. This Court has personal jurisdiction over each of the Counterclaim Defendants, on information and belief, each of whom has engaged in business activities in this District and the State of California, offered for sale certain replacement air filters in this District and in the State of California, knowingly and purposefully directed business activities to this District and the State of California, and availed themselves of the benefits afforded by California laws, and committed tortious acts, knowing that Counterclaim Plaintiffs would suffer injuries in this District and the State of California.

19. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391. Counterclaim Defendants have conducted, and continue to conduct, business in this District, and a substantial part of the events or omissions, including Counterclaim Plaintiffs' injuries, giving rise to the claims occurred in this District.

## STATEMENT OF FACTS

**A. The Formation of AirDoctor and Its Affiliates by Peter Spiegel In The Wake of Multiple Enforcement Actions for His Prior Deceptive Marketing Practices.**

20. Peter Spiegel ("Spiegel") formed AirDoctor in 2018.

21. Spiegel formed each of the Counterclaim Defendants.

22. In the years prior to the formation of AirDoctor, Spiegel was the subject of multiple enforcement actions by government agencies for unfair and deceptive

marketing practices, including one investigation that led to a Consent Order with the Federal Trade Commission, and action by the United States Postal Service.

23. The FTC Consent Order continued for a period extending through at least September 2017 and prohibited Spiegel directly or through any new company from engaging in certain deceptive and unfair trade practices designed to mislead and confuse consumers. *See In re Kent & Spiegel Direct, Inc.*, 124 F.T.C. 300 (1997).

24. Just one year after the expiration of the FTC Order against Spiegel, he formed "AirDoctor."

25. While AirDoctor was legally formed as a separate company, in actuality it is merely a marketing brand that is owned by Ideal Living. AirDoctor has no assets; no bank accounts; no employees; no clients; no customers.

26. According to Ideal Living's website, AirDoctor is one of the brands in the "Ideal Living family of brands." Ideal Living describes itself as a "wellness-tech" company focused on giving people access to "pure water, clean air, and a solid foundation for wellness."

27. Thus, AirDoctor is the "air-quality / clean-air" arm of Ideal Living. Ideal Living holds itself out as the parent company/platform that develops, markets, and distributes AirDoctor products (and other wellness products) under a unified wellness-tech umbrella.

AMENDED COUNTERCLAIMS

28. Ideal Living positions itself as a "compassionate innovator" in the wellness industry — aiming to make health-related technologies (air filtration, water purification, etc.) accessible and effective.

29. In their marketing materials, Counterclaim Defendants place special emphasis on "science-backed" technology, third-party testing, and high-performance filtration.

30. The company narrative ties together "clean air," "clean water," and general wellness — suggesting that Ideal Living sees these as interrelated pillars of healthy living.

31. In other words, Ideal Living uses AirDoctor (and its other brands) to position itself as having a holistic wellness vision — not just selling isolated devices, but marketing a lifestyle oriented around environmental health (air + water + wellness).

32. AirDoctor's product line — under the Ideal Living umbrella — includes multiple air-purifiers targeting different needs (small rooms, medium rooms, large rooms, etc.). Examples include the AirDoctor AD3000 and AD3500 Air Purifier, together with replacement filters.

33. AirDoctor's tech claims reflect Ideal Living's purported commitment: for example, some models use an "UltraHEPA" filter capable (per third-party testing)

of capturing particles as small as 0.003 microns — far smaller than standard HEPA filters.

34. Upon information and belief, Counterclaim Defendants, in operating and managing the affairs of the various companies, have failed to observe certain fundamental corporate formalities, including without limitation, appointment of officers and election of directors who actively functioned within the corporations, regular and periodic keeping of corporate records, regular and periodic meetings of the Board of Directors, and the complete separation of corporate assets and/or operations as between each of the Counterclaim Defendants.

35. Indeed, according to one publicly filed complaint filed against certain of the Counterclaim Defendants by a long-time former/high level employee, Counterclaim Defendants have operated their companies in such a way to engage in fraudulent bookkeeping as an intentional strategy to hide wrongdoing.

36. Upon information and belief, Counterclaim Defendants consolidate all financials of the entities together and aggregate costs and revenues, in consolidated financial statements that make it difficult or impossible to attribute or isolate any particular economic activity and resulting revenues and expenses to any particular entity.

37. Other publicly available records shed substantial light on how Counterclaim Defendants shift the purported "owner" of the AirDoctor brand and

associated rights as their litigation needs suit them. By way of example only and not by way of limitation, in a publicly-available complaint filed by Spiegel and Ideal Living in 2023, they stated that Ideal Living

> "is recognized as a pioneer in the direct-to-consumer industry. Today, Ideal Living employs over eighty people and is promoted by international healthcare professionals and consumers, and still maintains its headquarters locally in Sherman Oaks. Ideal Living product lines today include its own designed, engineered and manufactured products: "AirDoctor®," –an air filtration system, "Aqua Tru®,"—a water filtration system for access to clean, healthy and pure drinking water, and "Therabotanics®"—natural supplements for healthier living."

38. In that same publicly-available complaint, Ideal Living disclosed that a former/high level manager of the company who had worked for the Counterclaim Defendants during the period 2006 through 2023, had accused Spiegel and the company of creating and maintaining false financial statements.

39. Upon information and belief, while Ideal Living was claiming for itself the ownership of the brand and that it employed over 80 people, in practice Counterclaim Defendants have used Ideal Living Management as the legal entity to employ some or all of the employees who, on behalf of Counterclaim Defendants, engaged in the wrongdoing that is set forth below.

40. In this action, when required to produce a corporate designee who would give binding testimony on behalf of AirDoctor concerning the inter-relationship between that company and each of the Counterclaim Defendants, AirDoctor

produced a witness who could not articulate any cogent factual or legal relationship between the Counterclaim Defendants.

41. At the same time that Ideal Living was pursuing litigation in state court claiming ownership and control of the AirDoctor brand, AirDoctor itself was pursuing multiple cases before this Court claiming, instead, that it truly owned and controlled that same brand.  By way of example in *AirDoctor v. Homeburg*, 2:23-cv-00352 (C.D. Cal.), Dkt. 1), AirDoctor claimed to own and control the AirDoctor brand and the right to bring suit for alleged harm by a competitor.

42.  In footnote 2, thereof (*id.*), AirDoctor disclosed that the original filer of its trademark registration was yet another entity, Ideal Living Ventures Ltd.  This is another entity from whom Counterclaim Defendants are unable to provide any explanation of the relationship, whether through the production of competent records or testimony of FRCP 30(b)(6) witness.

43. The evidence of a failure to observe corporate formalities on the part of the Counterclaim Defendants is widespread and obvious.  One recent example is reflected in a USPTO Trademark Assignment and related Confirmatory Grant of Security Interest, recorded with the USPTO on July 11, 2025. *See* **Exhibit A**.

44. In this document, a group of Delaware LLCs associated with the AirDoctor / Ideal Living business structure, including Ideal Living and AirDoctor, granted a security interest to JPMorgan Chase Bank, N.A.  The document reflects

the encumbrance of a large portfolio of registered and pending U.S. trademarks associated with the businesses (44 listed), including the AirDoctor® marks at issue in this case.

45. This is a security interest filing — meaning the trademarks are pledged as collateral for a credit agreement (loan financing).  JPMorgan is acting as administrative agent for the lenders.

46. Spiegel signed for each and every one of the entities with the same title: Co-CEO/Co-President.

47. The assignment and security interest confirms that the companies' trademarks are common collateral securing a loan for the entire brand/IP portfolio.

48. It shows corporate interconnection between AirDoctor, Ideal Living, Aqua Tru, Ionic Pro, and Therabotanics — all executed by the same officer.

49. The core grant language says each Grantor grants the bank a security interest in "the Trademarks" (as set forth in Exhibit A). The exhibit then lists all 44 marks and labels each with an Owner of Record column.  All marks were included in a single, consolidated Exhibit A, which noted an "Owner of Record," but acknowledged the legal rights of each entity to all of the marks.

50. In other words, in this assignment and security interest, each of the corporate entities was taking responsibility for collateral across the entire brand portfolio, not just the marks registered to it.

51. If the companies were truly distinct, each grantor would only pledge its own registered marks.  Guarantees and cross-collateralization would be expressly limited.  Instead, this assignment and security interest reflects the obvious:

    a.  One executive — Peter Spiegel — signing for every entity;

    b.  All IP is thrown into a single shared collateral pool;

    c.  No effort is made to try to separate which company benefits from which brand or product line; and

    d.  JPMorgan treats the group as a single operating enterprise, precisely because that is how these companies operate in practice.

52. Upon information and belief, in 2022, Counterclaim Defendants began to be concerned that competitors were gaining market share and they therefore began to closely track the sales of any companies selling replacement air filters for AirDoctor air purifiers.  They ultimately decided to sue them in order to increase their market share of the replacement air filter business.

53. Commencing in 2022, AirDoctor began to engage in broadscale litigation against multiple sellers of replacement air filters, using cooker-cutter allegations which, in each instance, claimed, inter alia, that the replacement air filters were cheap, flimsy, foreign knock-offs.

**B. The Commencement Of This Litigation.**

54. On January 18, 2023, AirDoctor initiated this action.

55. Upon information and belief, AirDoctor initiated this lawsuit in an improper attempt to eliminate competition for the replacement filters marketed and sold for use in certain Airdoctor air purifiers.

56. Upon information and belief, AirDoctor filed complaints with Amazon and caused Counterclaim Plaintiffs' filters to be delisted after the commencement of this litigation, as part of this concerted effort to eliminate competition through improper and unfair means. Counterclaim Plaintiffs wish to continue selling the delisted products, but have been thwarted by this tactical campaign waged by Counterclaim Defendants.

57. In its FAC, and consistent with its online marketing materials, Airdoctor has alleged that its filters meet or exceed the U.S. Department of Energy's HEPA standard, effectively removing "at least 99.97% of dust, pollen, mold, bacteria, and any airborne particles with a size of 0.3microns." *See* Dkt. No.86 ¶34.

58. Counterclaim Defendants have advertised at all relevant times that its filters remove at least 99.99% of particles as small as 0.003 microns. Id ¶¶ 35, 39.

59. On Counterclaim Defendants' website (available at https://airdoctorpro.com/3-reasons-why-you-should-never-buy-fake-or-generic-airdoctor-filters/?c=1709750487), Counterclaim Defendants have long claimed that its UltraHEPA filters capture 99.99% of airborne particles as small as 0.003 microns.

AMENDED COUNTERCLAIMS

60. This messaging is consistent with Counterclaim Defendants' advertising, labeling, and packaging for the  AirDoctor filters, wherein Counterclaim Defendants claim that their products remove particles that are 100 times smaller than the standard HEPA filter requirement of 0.3 microns.

61. These and other claims are patently misleading and false, and give consumers a false sense of the filter's overall efficacy across all particle sizes, potentially exaggerating the performance of the product. *See* **Exhibit B**.

62. Response Products has advertised that its "UltraHEPA filters removes 99.99% of particles at .003 microns" in its advertising, labeling, and packaging of the AirDoctor filters on Amazon, the same platform on which Counterclaim Plaintiffs have historically sold replacement air filters. *See* **Exhibit C**; *See also* https://www.amazon.com/AIRDOCTOR-AD3000-AD3500-Replacement-Filter/dp/B0CCJYH1FF/ref=sr_1_5?crid=2UVO47VQOHC5T&dib=eyJ2IjoiMSJ%E2%80%A6&th=1.

63. Ideal Living, LLC has advertised the following in its advertising, labeling, and packaging of the AirDoctor filters: "UltraHEPA™ filter … captures an impressive 99.99% of ultra-fine particles as small as .003 microns – 100 times smaller than the standard HEPA filter. AirDoctor's air purifiers also remove 99.97% of the COVID-19 virus." *See* **Exhibit D**; *See also* https://enterprise.idealliving.com/air-solution-health-wellness/.

64. Upon information and belief, each of the Counterclaim Defendants has played an active, integral and central role in the manufacture and distribution of AirDoctor filters.

65. An examination of U.S. import records demonstrates that AirDoctor branded products are shipped into the U.S. from China and ordered by not just AirDoctor but also Ideal Living and other Counterclaim Defendants.

66. Upon information and belief, despite the mantra recited in the various AirDoctor pleadings that its competitors' products are all foreign-sourced and "cheap and flimsy," at all relevant times Counterclaim Defendants sourced the AirDoctor filters predominantly from Chinese manufacturers.

67. Despite the allegation made in this case by AirDoctor against Counterclaim Plaintiffs that their filters were "cheap and flimsy," discovery has shown that AirDoctor took no meaningful steps to even analyze the frames and material utilized in Counterclaim Plaintiffs' replacement air filters to even make those allegations in the first place.

68. Independent laboratory testing of the AirDoctor brand filters by an international testing firm, Intertek, has shown that the fractional efficiency of said air filters is 99.94% for 0.05um particles. *See* **Exhibit E**. Therefore, for particles as small as 0.003 microns, the fractional efficiency could not possibly be higher than 99.94%.

69. Accordingly, Counterclaim Defendants' advertisements that AirDoctor UltraHEPA filters capture 99.99% of airborne particles as small as 0.003 microns are false.

**Test result**

| Table 1 | Filtration performance | --- |
|---|---|---|
| Normal air volume flow rate m³/h | | 161 |
| Test aerosol substances | | Latex beads, Neutralized |
| Particle size range (µm) | | 0.05 |
| Sample No. | Δ Pa | Fractional efficiency (%) |
| 0240515-32 | 17 | 99.94 |

**Results summary:**
One sample was tested, fractional efficiency is 99.94% for 0.05um particles.

70. Intertek testing of Counterclaim Defendants' air filters further demonstrates that, for particles measuring 0.3 microns, the fractional efficiency was 99.961%, which falls short of the U.S. Department of Energy's HEPA standard requiring a minimum efficiency of 99.97%. Therefore, Counterclaim Defendants' filters do not meet HEPA standard.

| Test air flow rates, m³/h | | | 161 | | | Pressure loss av., Pa | | 17 |
|---|---|---|---|---|---|---|---|---|
| No. | Pressure loss, Pa | Port | Particles: 10l at (in nanometers) | | | | | |
| | | | 50 | 80 | 90 | 100 | 150 | 200 | 300 |
| 1 | 17 | Upstream | 69763 | 64275 | 62488 | 57575 | 47850 | 40700 | 35000 |
| 2 | 17 | Downstream | 42 | 35 | 37 | 32 | 24 | 18 | 12 |
| Upstream, 95% min | | | 69889 | 64397 | 62608 | 57690 | 47955 | 40797 | 35090 |
| Downstream, 95% max | | | 45 | 38 | 40 | 34 | 26 | 20 | 14 |
| Efficiency, E % | | | 99.940 | 99.946 | 99.941 | 99.945 | 99.950 | 99.955 | 99.966 |
| Efficiency, $E_{95\%}$ min, % | | | 99.935 | 99.941 | 99.937 | 99.940 | 99.945 | 99.950 | 99.961 |

71. Counterclaim Defendants' website asserts that "fake" or "generic" filters do not meet HEPA standards and that only AirDoctor-certified filters provide "true

HEPA performance." This claim misleads consumers into believing that other HEPA certified filters, such as those sold by Counterclaim Plaintiffs, are ineffective. *See* **Exhibit B**.

**2. Fake Filters Don't Capture Key Contaminants**

Genuine AirDoctor filters like our UltraHEPA filter are tested & proven to capture the ultra-fine, microscopic contaminants you can't see like PM 2.5. That means particles that are 2.5 microns are smaller. AirDoctor is tested and proven to capture particles as small as 0.003 microns in size. That includes particles like dust, pollen, mold spores, smoke, pet hair, pet dander, bacteria, and viruses. Remember, ultra-fine particles are the ones that are most harmful to human health because they are capable of passing through your lungs and directly into your bloodstream.

And AirDoctor's Gas Trap Carbon filter uses a proprietary blend of activated carbon and potassium permanganate to capture invisible gasses and chemicals you can't see like ozone and formaldehyde. We use a unique blend of this material in our Carbon filters that is more expensive than generic activated carbon so that it actually removes volatile organic compounds (VOCs) like formaldehyde.

Generic filters may look similar to genuine AirDoctor filters, but they fail in comparison when it comes to performance. This leaves you exposed to dangerous contaminants that you invested in your AirDoctor to protect you against.

72. In addition to these improper tactics, upon information and belief, Counterclaim Defendants have engaged in other unlawful sales practices by, *inter alia*:

   a. distributing a video that is widely viewed on Amazon that purports to show an air purifier clearing a room of smoke where the air purifier being used in the video has long been discontinued; and

   b. adopting a plan within the organizations to have family members purchase AirDoctor products so that they can give positive reviews, fail to have them disclose that the company has asked them to do so, and secretly reimbursing those family members for the purchase.

-19-
AMENDED COUNTERCLAIMS

73. Each of the Counterclaim Defendants has knowingly and intentionally engaged in such practices while also allowing false advertisements to remain online, and continuing to distribute same through online channels like Amazon, even after the falsity of such advertising was identified by Lonni on September 26, 2024.

74. Counterclaim Plaintiffs have suffered damages and will continue to suffer damages due to Counterclaim Defendants' false advertising and the delistings resulting from AirDoctor's complaints to Amazon, which delistings were themselves predicated on false and erroneous information.

## C. Counterclaim Defendants' Alleged "Independent Third-Party Laboratory Testing."

75. In its FAC, and consistent with long-standing marketing tactics on Amazon and through internet sales, AirDoctor has claimed that it "advertises independent third-party laboratory testing showing the AirDoctor Air Purifiers' effectiveness …" *See* Dkt. No. 86 ¶5.

76. AirDoctor further alleges that it "rel[ies] on science and independent third-party testing." Dkt. No. 86 ¶28.

77. AirDoctor further alleges that "Independent laboratory testing of the AirDoctor Air Purifiers and AirDoctor UltraHEPA Filters confirms that they not only meet the HEPA standard (See Exhibits F), but also remove at least 99.99% of

particles as small as 0.003 microns (or 100 times smaller than the HEPA standard)." Dkt No. 86 ¶35.

78. Paragraph 38 of the FAC, consistent with extensive marketing materials distributed by AirDoctor, claims that AirDoctor's claims are backed by "rigorous, third-party laboratory testing." Id., ¶38.

79. Exhibit D to the FAC is a testing report from LMS Technologies, Inc. ("LMS"), dated May 11, 2017, concerning the alleged AirDoctor filter, showing that LMS tested the AirDoctor air filter utilizing a flow rate of 60 fpm (30 cm/s). Dkt No. 86-5.

80. Exhibit E to the FAC is a testing report from LMS, dated November 16, 2021, concerning the alleged AirDoctor filter, showing that LMS utilized a flow rate of 95 cfm / 63.5 fpm in testing AirDoctor's filters. Dkt No. 86-5.

81. Exhibit F to the FAC is a testing report from LMS, dated January 25, 2022, concerning the alleged AirDoctor filter, showing a flow rate of 340 cfm was used in testing Airdoctor's air filters. Dkt. No. 86-6.

82. Exhibit M to the FAC is a testing report from LMS, dated April 10, 2023, concerning the alleged isinlive filter, showing a flow rate of 95 cfm, Dkt. No. 86-13.

83. Exhibit P to the FAC is a testing report from LMS, dated May 5, 2023, concerning the alleged Jorair filter, showing a flow rate of 340 cfm with the filter tested inside the unit. Dkt. No. 86-16.

84. AirDoctor further alleges "[t]he AirDoctor Website allows consumers to view the laboratory test results." Dkt. No. 86 ¶39.

85. Consistent with what is claimed in the FAC, the Counterclaim Defendants advertise on the Ideal Living website that the AirDoctor air filter replacement product is "backed by rigorous third-party testing for superior performance and peace of mind". See Exhibit E; See also https://airdoctorpro.com/. Upon review of the test report directly linked to the advertising that it was "Independently tested and scientifically proven to capture airborne particles as small as 0.003 microns", a testing report from LMS, dated May 11, 2017, reflects, however, that Counterclaim Defendants directed LMS to utilize an artificially low flow rate of 60 fpm when testing its air filters. *See* **Exhibit F**; *See also*, https://cdn.builder.io/o/assets%2F907dedd21ad54876a62d88580a060f2b%2F2efb23a77e2240359654d954cc9713a7?alt=media&token=707e9d7f-5f49-442e-b0ff-e4f07de074d1&apiKey=907dedd21ad54876a62d88580a060f2b.

86. Contrary to the alleged "rigorous" and "independent," "third-party laboratory testing" that Counterclaim Defendants have told the public about in their marketing materials for the AirDoctor branded replacement air filters, LMS is neither "independent" of Counterclaim Defendants, nor could anyone in good conscience claim that LMS used a rigorous process in the testing standards and methodologies that it has applied to the testing of the AirDoctor branded air filters.

AMENDED COUNTERCLAIMS

87. In point of fact, LMS has taken direction from Counterclaim Defendants on what protocols to use in the testing of air filters, including but not limited to taking specific direction on which speed to utilize when testing air filters, and intentionally utilizing a slow speed when testing these air filters, but utilizing a fast speed when conducting supposed "independent testing" to be used to bring claims against competitors like Counterclaim Plaintiffs.  *See* **Exhibit G**.

88. These tactics in "gaming" the testing were employed after close coordination between Spiegel and multiple employees of Counterclaim Defendants, and were intentional tactics intended to skew the results in a false manner.

89. Upon information and belief, Counterclaim Defendants also employed the improper tactic of having their testing company run, and re-run, tests as many times as it took to get a passing result.

90. Discovery has likewise shown that, contrary to being "independent," LMS in fact gave draft testing reports to Counterclaim Defendants such that they were permitted to edit same. *See* **Exhibit H**.

91. LMS has confirmed that, despite its counseling to Counterclaim Defendants that a more rigorous process existed for testing including a certification process, Counterclaim Defendants instead opted for a bare bones/cheap alternative wherein they paid just $500 for each test.  *See* **Exhibit J**, Vatine Tr., at 20:22-21:4; 61:12-16.

92. These cheaper, "noncertified" tests resulted in LMS conveniently discarding the relevant testing materials in just one month, which means that it did not retain the testing materials allegedly utilized in the so called "rigorous testing" that forms the basis for the claims made by Counterclaim Defendants concerning the AirDoctor branded air filters. The only thing retained was the misleading test results, which, as set forth herein, were obtained through intentional manipulation of the testing. Id.

93. Indeed, as noted above, discovery has conclusively shown that Counterclaim Defendants knowingly applied higher flow rates when testing Counterclaim Plaintiffs' filters, while contending that those higher flow rates are proper. However, the very LMS May 11, 2017 testing results which have, for years, formed the basis for AirDoctor's false claims of superiority over its competitors, applied a significantly lower flow rate in direct contravention of applicable testing standards.

94. Notwithstanding that Counterclaim Defendants were aware for a long period of time that they utilized the wrong flow rates in this 2017 testing, Counterclaim Defendants have allowed these erroneous test results and associated advertisements to remain in place in their various marketing materials. *See* **Exhibit K**, Pedersen Tr., at 65:23-70:11.

95. The alleged rigorous testing by LMS is further undermined by the testimony of LMS's principal owner, who testified that one filter can be tested 50 times without any effect, *See* **Exhibit J**, Vatine Tr., at 54:24-55:5, while experienced and truly independent laboratories (such as SGS) will require multiple sample filters to conduct just one test.

96. Moreover, if it were not clear enough that LMS is far from "independent" of AirDoctor, Counterclaim Defendants withheld communications they had with LMS in discovery, and when this was discovered belatedly placed communications with LMS on a privilege log, claiming that its communications with LMS were "work product protected." *See* **Exhibit I**.

97. Lastly, upon information and belief, Counterclaim Defendants utilized certain nomenclature in their branding and marketing of the AirDoctor air filters in order to further confuse and materially mislead the consumer into purchasing their product over the product of their competitors, such as Counterclaim Plaintiffs. In this regard, they have marketed and continue to market certain of their air filters as being "UltraHEPA."

98. The use of this terminology is, itself, entirely meaningless, and is being used by Counterclaim Defendants to actively and perniciously deceive consumers into believing they are purchasing filters that meet ULPA standards.

AMENDED COUNTERCLAIMS

99. "UltraHEPA" is a marketing gimmick invented by Counterclaim Defendants in order to improperly suggest a known certification category ("ULPA") — but AirDoctor filters do not meet ULPA standards.

100. "ULPA" stands for Ultra-Low Penetration Air filters. These are used in high-sensitivity clean rooms and are well-defined and certified by established standards (IEST-RP-CC001 in the U.S. and EN-1822-1 in Europe). Under such ULPA standards, a filter must remove 99.999% of particles $\geq 0.12$ microns.

101. By intentionally using the marketing phrase "UltraHEPA" Counterclaim Defendants imply ULPA-level performance, but their product does not come close to meeting those rigorous requirements.

102. Additionally, other claims employed by Counterclaim Defendants such as their claim to be able to remove 99.97% of SARS-CoV-2 are invalid because the particles nebulized in testing were larger than 3 microns, and the testing was performed under very low airflow rates, which serves to exaggerate filtration efficiencies.

103. All of these tactics were employed by Counterclaim Defendants in an effort to counter their declining market share and take sales away from their competitors, such as Counterclaim Plaintiffs, whom Counterclaim Defendants were closely tracking through their use of HELIUM-10 analytics.

104. Through Counterclaim Defendants' concerted actions, as aforesaid, Counterclaim Plaintiffs have suffered damages and will continue to suffer damages due to Counterclaim Defendants' false advertising and related misconduct.

## COUNT I

## False Advertising In Violation Of The Lanham Act, 15 U.S.C. § 1125(A)

## Against All Counterclaim Defendants

105. Counterclaim Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

106. Counterclaim Plaintiffs and Counterclaim Defendants are direct competitors in the market for the sale of consumer replacement filters for air purifiers.

107. Counterclaim Defendants have made, and continue to make, false and/or misleading claims in commercial advertising. For example, and without limitation, Counterclaim Defendants have falsely represented that the AirDoctor branded "UltraHEPA filters" capture 99.99% of airborne particles as small as 0.003 microns; their filters meet HEPA standard; and that their filters are allegedly supported by rigorous and independent third-party laboratory testing.

108. Such commercial advertising by Counterclaim Defendants constitutes false and misleading statements of fact that misrepresent the nature, qualities, and characteristics of their filters and those of Counterclaim Plaintiffs in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

109. Counterclaim Defendants have disseminated these false and misleading advertising claims throughout the United States, and these claims were made in interstate commerce.

110. Counterclaim Defendants adopted these (and other) false and misleading advertising claims as part and parcel of a strategy to take back market share from competitors it had specifically identified in its market research.

111. Each of the Counterclaim Defendants materially contributed to the efforts in this regard, and benefitted financially, to the detriment of Counterclaim Plaintiffs.

112. Counterclaim Defendants' false and misleading advertising is material, in that it has actually deceived, has a tendency to deceive, and/or is likely to deceive consumers and influence a consumer's purchasing decision.

113. As a direct and proximate result of Counterclaim Defendants' false advertising, Counterclaim Plaintiffs have suffered and will continue to suffer significant damages to its business reputation, goodwill, and market share, loss of sales, and profits due to the direct diversion of sales from Counterclaim Plaintiffs.

114. Counterclaim Defendants have acted in bad faith and have knowingly, willfully, and deliberately engaged in false advertising with the intent to deceive the public and injure their competitors, including Counterclaim Plaintiffs.

115. Counterclaim Plaintiffs have suffered and are likely to continue to suffer irreparable injury and have no adequate remedy at law, and thus are entitled to injunctive relief.

116. Counterclaim Plaintiffs are also entitled to the recovery of all available damages, including but not limited to, lost profits, attorneys' fees, costs of the action, and Counterclaim Defendants' profits, in an amount to be proven at trial.

117. This is an exceptional case within the meaning of Section 35 of the Lanham Act, 15 U.S.C. § 1117, entitling Counterclaim Plaintiffs to treble damages and to the recovery of attorneys' fees.

## COUNT II

### Violation of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq Against All Counterclaim Defendants

118. Counterclaim Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

119. Counterclaim Defendants' false advertising constitutes unlawful, unfair, and fraudulent business practices under California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 *et seq*.

120. Counterclaim Defendants made or disseminated, or caused to be made or disseminated, before the public in this State, deceptive, untrue or misleading statements in connection with the sale of their filters, that Counterclaim Defendants

knew, or in the exercise of reasonable care should have known were deceptive, untrue or misleading concerning the sale of Counterclaim Defendants' product and were likely to mislead or deceive a reasonable consumer.

121. Counterclaim Plaintiffs and Counterclaim Defendants are direct competitors in the market for the sale of consumer replacement filters for air purifiers.

122. Counterclaim Defendants' conduct constitutes "unfair", "fraudulent" and "unlawful" business practices as they have gained an unjust competitive advantage by misrepresenting the quality and performance of their own products and by falsely asserting that filters sold by competitors, including Counterclaim Plaintiffs, are inferior and substandard.

123. These actions harmed Counterclaim Plaintiffs' business and reputation and misled consumers, causing competitive injury that outweighs any benefit.

124. These actions by Counterclaim Defendants were, in fact, directly targeted at Counterclaim Plaintiffs after Counterclaim Defendants identified them in their market research.

125. By reason of Counterclaim Defendants' acts of unfair competition, Counterclaim Plaintiffs have suffered and will continue to suffer irreparable injury unless and until this Court enters an order enjoining Counterclaim Defendants from any further acts of unfair competition.

126. Counterclaim Defendants' continuing acts of unfair competition, unless enjoined, will cause irreparable damage to Counterclaim Plaintiffs in that they will have no adequate remedy at law to compel Counterclaim Defendants to cease such acts, and no way to determine their losses proximately caused by such acts of Counterclaim Defendants.

127. Counterclaim Plaintiffs are therefore entitled to a preliminary injunction and a permanent injunction enjoining Counterclaim Defendants from engaging in further unlawful, unfair, or fraudulent business practices, as well as removal of all false and misleading advertising, labeling, packaging, and promotional materials.

128. As a result of Counterclaim Defendants' unlawful, unfair, and fraudulent business practices, Counterclaim Plaintiffs have suffered and continue to suffer economic injury, including lost sales, reduced market share, and reputational harm, and are entitled to all available remedies under law, including but not limited to injunctive relief, damages, attorneys' fees, costs and pre and post judgment interest.

## **COUNT III**

## **Violation of California False Advertising Law (Cal. Bus. & Prof. Code § 17500 et seq.) Against All Counterclaim Defendants**

129. Counterclaim Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

AMENDED COUNTERCLAIMS

130. Counterclaim Plaintiffs and Counterclaim Defendants are direct competitors in the market for the sale of consumer replacement filters for air purifiers.

131. Counterclaim Defendants have engaged in false and misleading advertising in violation of Cal. Bus. & Prof. Code § 17500 *et seq* by making or disseminating, or causing to be made or disseminated, before the public in this State, deceptive, untrue or misleading statements in connection with the sale of their filters, that Counterclaim Defendants knew, or in the exercise of reasonable care should have known were deceptive, untrue or misleading concerning the sale of Counterclaim Defendants' product and were likely to mislead or deceive a reasonable consumer.

132. In adopting these unfair practices, each of the Counterclaim Defendants specifically targeted Counterclaim Plaintiffs in an effort to wrest market share from their competitors.

133. Counterclaim Defendants' advertising constitutes a violation of California's False Advertising Law, as it involves statements of their filters that are untrue, misleading, and likely to deceive consumers.

134. Counterclaim Defendants' conduct is unlawful, as their advertising was disseminated to the public with knowledge that the statements were false or with reckless disregard for the truth.

135. Such advertisements have deceived and are likely to deceive the consuming public, in violation of Business & Professions Code § 17500.

136. By reason of Counterclaim Defendants' acts of unfair competition, Counterclaim Plaintiffs have suffered and will continue to suffer irreparable injury unless and until this Court enters an order enjoining Counterclaim Defendants from any further acts of unfair competition.

137. Counterclaim Defendants' continuing acts of unfair competition, unless enjoined, will cause irreparable damage to Counterclaim Plaintiffs in that they will have no adequate remedy at law to compel Counterclaim Defendants to cease such acts, and no way to determine their losses proximately caused by such acts of Counterclaim Defendants.

138. Counterclaim Plaintiffs are therefore entitled to a preliminary injunction and a permanent injunction enjoining Counterclaim Defendants from engaging in further unlawful, unfair, or fraudulent business practices, as well as the removal of all false and misleading advertising, labeling, packaging, and promotional materials.

139. Counterclaim Defendants' false advertising has caused significant harm to Counterclaim Plaintiffs. Consumers have been misled into purchasing Counterclaim Defendants' products instead of Counterclaim Plaintiff's products based on false or exaggerated performance claims.

140. As a direct and proximate result of Counterclaim Defendants' acts of deceptive, untrue, and misleading advertising, Counterclaim Defendants have wrongfully appropriated Counterclaim Plaintiffs' profits and substantial investments of time, effort, and money in their business, goodwill, and reputation.

141. Counterclaim Defendants' actions, as described above, constitute false and misleading descriptions and misrepresentations of fact in California which, in commercial advertising and promotion, misrepresent the nature, characteristics, and qualities of their products in violation of the False Advertising Law at Business & Professions Code § 17500, *et seq*.

## **PRAYER FOR RELIEF**

WHEREFORE, Counterclaim Plaintiffs demand judgment in their favor and against Counterclaim Defendants as follows:

1. That AirDoctor take nothing by its complaint;

2. That the Court enter judgment against Counterclaim Defendants, jointly and severally, and in favor of Counterclaim Plaintiffs and that AirDoctor's claims be dismissed in their entirety, with prejudice;

3. Finding that Counterclaim Defendants have violated the Lanham Act, the California Unfair Competition Law, and the California False Advertising Law;

4. Temporarily, preliminarily, and permanently enjoining, restraining, and forbidding Counterclaim Defendants and their principals, servants, officers,

directors, partners, agents, representatives, shareholders, employees, affiliates, successors, assignees, and all others acting in concert, or who participates with Counterclaim Defendants, from further violations of the Lanham Act, the California Unfair Competition Law, and the California False Advertising Law as alleged herein;

5. Requiring Counterclaim Defendants to disseminate, at their sole and exclusive cost, corrective advertising to consumers;

6. Awarding to Counterclaim Plaintiffs actual, compensatory, consequential, statutory, special, and/or punitive damages in an amount to be proven at trial and/or otherwise provided for by law;

7. Disgorgement of Counterclaim Defendants' sales and profits;

8. Compensation for all damages caused by Counterclaim Defendants;

9. Awarding Counterclaim Plaintiffs restitution;

10. Awarding Counterclaim Plaintiffs interest, costs, and reasonable attorneys' fees incurred by Counterclaim Plaintiffs in prosecuting and defending this action;

11. Declare that this is an "exceptional case" that warrants an award of attorney's fees against Counterclaim Defendants;

12. Granting Counterclaim Plaintiffs pre-and post-judgment interest on its damages, together with all costs and expenses;

AMENDED COUNTERCLAIMS

13. Awarding Counterclaim Plaintiffs such other and further equitable relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Counterclaim Plaintiffs hereby request a jury trial for all issues triable by jury.

Date: 12/10/2025                              /s/ Jie Li
                                             Jie Li, Esq.
                                             Jie.li@glacier.law
                                             Glacier Law LLP
                                             *Attorney for Counterclaim Plaintiffs*